**WESTMORELAND MANGANESE COR-
PORATION, Appellant,**

v.

**UNITED STATES of America,**
Appellee.

No. 15500.

United States Court of Appeals
Eighth Circuit.

June 26, 1957.

M. F. Highsmith, Batesville, Ark., and
Richard B. McCulloch, Forrest City,
Ark., for appellant.

Harold S. Harrison, Atty., Dept. of
Justice, Washington, D. C. (Peﬁry W.

Morton, Asst. Atty. Gen., Osro Cobb, U. S. Atty., Little Rock, Ark., and Roger P. Marquis, Atty., Dept. of Justice, Washington, D. C., on the brief), for appellee.

Before WOODROUGH, VOGEL and VAN OOSTERHOUT, Circuit Judges.

VAN OOSTERHOUT, Circuit Judge.

This is an appeal by Westmoreland Manganese Corporation, hereinafter called Westmoreland, from a judgment foreclosing mortgages given the Government by Westmoreland. The Government, pursuant to the Defense Production Act of 1950, 50 U.S.C.A.Appendix, § 2061 et seq., entered into a contract to lend Westmoreland $3,807,250 to aid it in acquiring and developing a manganese ore mining and processing plant, Westmoreland agreeing to sell the manganese ore, which was considered a strategic and critical metal, to the Government upon agreed terms. Mortgages were executed and delivered to secure the money to be loaned. Government funds totaling nearly $3,000,000 were advanced to Westmoreland. On October 23, 1953, the Government, acting under the terms of Amendment No. 1 to the contract, terminated the contract, and on January 8, 1954, commenced this foreclosure action. The original contract and mortgage provided that, if Westmoreland defaulted in the performance of any of the obligations assumed by it in said instruments and if such default remained unremedied for 60 days after notice thereof, the Government would have the right to declare all indebtedness secured by the mortgage due and could foreclose the mortgage. It is conceded that the Government did not give Westmoreland the 60 days' notice required by the original instruments. The Government asserts its right to foreclosure by virtue of Amendment No. 1 to the contract, dated April 2, 1953, set out in the footnote.[1]

---

1. This amendment to Letter Order No. GS–OOP(D)–12263 between the United States of America, acting by and through the Defense Materials Production Agency, hereinafter referred to as the "Government" (pursuant to the authority contained in the Defense Production Act of 1950, as amended, and Executive Order No. 10161, as amended and supplemented), and Westmoreland Manganese Corporation, hereinafter referred to as the "Contractor"

*Witnesseth that:*

Whereas, the parties hereto entered into Letter Agreement No. GS–OOP(D)–12263, dated April 7, 1952, (hereinafter referred to as the "Contract"), under the terms of which the Contractor covenanted to construct facilities (as defined in the aforesaid Contract), at or near Cushman, Arkansas, which would enable Contractor to produce and process manganese ore within a period of one year from the date of the Contract; and

Whereas, the aforesaid facilities have not been completed and the production of manganese ore will not be commenced within the period provided in the Contract; and

Whereas, the Contractor is without funds to complete the aforesaid facilities and has currently outstanding due and overdue financial obligations to employees, ex-employees, suppliers, contractors and general creditors, which obligations the Contractor is unable to meet.

Now, therefore, in consideration of the mutual promises herein contained and other good and valuable consideration, the parties hereto agree as follows:

1. The Contractor shall place the facilities in a temporary standby condition and shall employ standard methods for preserving the facilities from the elements, theft and damage. All operations at the facilities shall cease, except that the Contractor shall continue with the program for mineral drilling now currently in progress. Funds for the payment of the costs of such drilling program and costs for the maintenance of the facilities while in a standby state shall be made available by the Government out of funds to be provided under the terms of the Contract. Disbursement of such funds shall be made in accordance with the provisions of paragraph 2 hereof, and allowable costs for such work shall be subject to approval by the Government.

2. To enable the Contractor to meet certain of the aforesaid outstanding accrued obligations, the Government shall advance to the Contractor out of funds allotted pursuant to the Contract not to exceed $29,080.42, which sum shall be advanced by the Government to the Contractor only on the condition that the Contractor raises and provides the sum of

It is not seriously questioned that the amendment gives the Government the right to terminate the contract at any time prior to commencement of production, or that Westmoreland has expressly waived the requirement that the 60 days' notice of default be given as well as all other moratorium provisions of the original instrument. Westmoreland's defense is that Amendment No. 1 is not supported by a valid consideration, and hence is not binding upon it. Westmoreland concedes that if Amendment No. 1 is supported by consideration, this foreclosure is authorized.

The trial court found that the amendment is supported by consideration and the Government was entitled to foreclose.

Westmoreland had also asserted in the trial court that the amendment was induced by fraud. The trial court rejected this contention. Westmoreland in its brief states it has abandoned the fraud issue.

The trial court summarizes the law applicable to the consideration issue as follows (134 F.Supp. 898, 910):

"With regard to consideration, the applicable principles of law are well settled and may be briefly stated: Parties who are capable of making a contract in the first instance are likewise capable of varying or modifying its terms, and their mutual agreements or undertakings in that connection furnish consideration for the modification; moreover, consideration for a contract may be found not only in benefits moving to the promisor (in this case Westmoreland), but also in legal detriment suffered by the promisee (here the

---

Fifteen Thousand ($15,000) Dollars to be used to help meet the aforesaid obligations; the aggregate of the aforesaid funds shall be disbursed under procedures to be prescribed by the Government. Current obligations payable pursuant to this paragraph shall be principally the accrued and payable wages and salaries of Contractor's bona fide employees of the clerical, laborer and supervisory class. All obligations payable out of the aforesaid aggregate funds shall be determined by the Government. The expenses of the drilling program and maintenance of the facilities referred to in paragraph 1 hereof shall be paid under procedures to be prescribed by the Government.

3. Notwithstanding any provision in the Contract to the contrary, the Contractor hereby grants to the Government the unqualified right and privilege of terminating the Contract at any time in the future up to commencement of production upon determination by the Government that termination of the Contract is in the best interest of the Government; the Contractor shall take no legal action to prevent such termination of the Contract by the Government, and disclaims any and all recourse by reason of such termination by the Government.

4. Under the terms of a mortgage instrument made by the Contractor to the Government on May 22, 1952, pursuant to the terms of the Contract, it is provided that the Contractor shall have sixty (60) days from notice to remedy the Contractor's failure or refusal to perform any covenant, agreement or condition in the Contract, note or mortgage as a condition precedent to foreclosure. Contractor hereby waives the sixty-day period granted by said mortgage within which to remedy the breach, and agrees that henceforth all moratorium provisions contained in said mortgage shall be without force and effect, and in the event of termination of the Contract as provided in paragraph 3 hereof, the Contractor shall, on demand of the Government grant the Government immediate possession of the facilities, with the right to use the facilities in place or off-site, either directly or by contract, and the Government may lease and dispose of such facilities, provided, however, that nothing herein contained shall prejudice or impair the right of the Contractor to an accounting. Contractor shall, at the request of the Government, execute, deliver and record a supplemental mortgage under the terms of which the aforesaid sixty-day moratorium provisions shall be deleted from the original recorded mortgage.

5. The unexpended balance of the funds advanced to the Contractor now on deposit in the special bank account in the First National Bank, Batesville, Arkansas, shall be withdrawn and returned to the Government, the account of the Contractor shall be properly credited with such refund.

In witness whereof, the parties hereto have caused this document to be executed on this 2nd day of April, 1953.

Government) in reliance upon the agreement. Another principle of contract law, invoked by Westmoreland, is that ordinarily an undertaking by a party to do something that he is already obligated to do is not sufficient to constitute consideration; that general rule, however, is subject to an exception in cases where 'the very existence of the duty is the subject of honest and reasonable dispute.' 17 C.J.S. Contracts § 110."

Westmoreland in its brief states that it does not disagree with the law as above stated by the trial court, but that it does disagree with the court's application of the law to the facts of this case.

■■ It is, of course, the function of the trial court acting without a jury to determine disputed questions of fact. We are not authorized to try this case de novo. In reviewing the trial court's findings we must examine the evidence in the light most favorable to the prevailing party. A reversal is warranted only if the trial court's findings are clearly erroneous.

The trial court carefully explains in his opinion, reported at 134 F.Supp. 898, the basis of his findings that Amendment No. 1 was supported by a consideration. We agree with the trial court's analysis of the evidence and are convinced that he reached a permissible conclusion.

The original contract required Westmoreland to commence production of manganese ore in substantial quantities by April 7, 1953. In the whereas clauses of the amendment set out in footnote 1 Westmoreland conceded that production of manganese ore would not be commenced within the period required by the contract, and that it was without funds to complete the project contemplated by the contract, and that it had outstanding obligations it could not meet. The Government had severely criticized the management of Westmoreland prior to Stringham's appointment as acting manager in December 1952. In January of 1953 Stringham learned that the proceeds of the Government's loan would be inadequate to place the Westmoreland plant in operation, and that upwards of $500,000 additional money would be needed to complete the project. Prior to that time all reports and flow sheets had indicated that the project would be completed with the funds provided by the original loan. Negotiations for an additional loan from the Government were opened, and a formal request for $545,800 additional money was made, the application stating private funds were not available. While some evidence was introduced to the effect that private financing for the additional funds required might be possible, the court, on the evidence as a whole, was fully justified in reaching the conclusion that "Westmoreland knew that it could not complete construction within the time limited by the original agreement or without further funds from the Government, and it also knew that its management had been seriously criticized by the Government; how under such circumstances the directors could have seriously believed that they were in good standing with the Government with respect to their contract is hard to conceive; and we do not consider that they did so believe." After several days of conferences between the Government officials and Westmoreland's directors and attorneys, Westmoreland's board of directors authorized the signing of Amendment No. 1 on behalf of the corporation. Later, upon recommendation of the directors and Westmoreland's attorneys, the stockholders ratified the execution of Amendment No. 1.

The original contract provides that each request for an advance of funds be supported by a flow sheet. Shortly after the execution of the contract, at a conference between officials representing the Government and Westmoreland, a flow sheet was worked out and agreed upon showing the estimated cost of each major component of the contemplated construction work. A countersignature system was worked out whereby the Dallas, Texas, comptroller of the General Services Administration was to sign checks drawn against ad-

vances. Evidence introduced by the Government discloses that the comptroller was to satisfy himself that each voucher or check was legitimately charged against one of the components shown on the flow sheet, and that the total checks for any component part did not exceed the total amount estimated therefor. About the time the Government learned that the proceeds of the loan would fall a half million dollars short of completing the construction, the Government advised the Dallas comptroller that substantial overruns of the funds allocated to the various categories by the flow sheet should not be allowed unless and until such overruns were approved in Washington. Checks submitted by Westmoreland after February 10, 1953, which overran the accounts to which they were to be charged were not countersigned. As the result Westmoreland was unable to meet its payroll and other bills. Amendment No. 1 provides in part that the Government will advance Westmoreland $29,080.42 on condition that Westmoreland advance $15,000, said funds to be used to pay certain claims against Westmoreland, mostly for back wages. Both parties made the agreed amount of funds available. The trial court found the payment by the Government to be a consideration for Westmoreland's various promises in the amendment. Westmoreland's contention is that the Government by making this fund available was doing only what it was already legally obligated to do under its original contract. The trial court rejected this argument, stating (134 F. Supp. at page 915):

> " * * * When the Government finally agreed to advance funds to pay the laborers, it was taking a step that it had theretofore contended it was not required to take, and its agreement under such circumstances constituted consideration for the amendment."

In Board of Education of City of Albuquerque v. American Nat. Bank, 8 Cir., 294 F. 14, at page 19 this court stated:

> "If disputes have arisen under a contract, and the parties thereto enter into a new contract as a means of adjusting such disputes, such adjustment of disputes is a sufficient consideration."

■ We are satisfied that the Government asserted in good faith that it was not liable for back wages incurred by Westmoreland. In some instances the Government's position was that the account to which the wages were to be charged was already overrun, and that it was not obligated to furnish funds in excess of the amount allocated to the categories in the flow sheet. Some of the wages accrued in connection with new road construction. The Government contended that the new road project had never been authorized, and that the proceeds of the loan could not be used for such a project. We agree with the conclusion of the trial court that the Government's advance of funds to pay wages, which the Government in good faith claimed it was not obligated to pay under the original contract, constituted a consideration for the amendment.

■ The trial court also found that the Government's advance of money for drilling after the shutdown constituted consideration for the amendment. Westmoreland's position is that the drilling paid for by the Government subsequent to the date of the amendment was production drilling contemplated by the original contract, which the Government was obligated to pay for under the original contract. The Government contended that such drilling was exploratory and was designed to prove the existence of an adequate amount of ore to justify the continuation of the project. As to this issue the court states (134 F.Supp. at page 915):

> " * * * We find from the evidence in this case that although Westmoreland may have considered that the drilling program contemplated by the amendment was nothing more than development drilling, that program was, from the Govern-

ment's standpoint, exploratory in nature, and we further find that if it had not been so regarded by the Government, the latter would have been unwilling to finance it; as a matter of fact, the Government would have had no object in financing a program of merely development drilling at a time when no one knew whether or not the plant would ever be completed."

This conclusion finds adequate evidentiary support. Recent engineers' reports as to the irregular and discontinuous ore deposits had raised serious question whether there was a sufficient amount of suitable ore available to permit Westmoreland to meet the production requirements of the original contract. The adequacy of the ore supply was a crucial factor in determining whether additional Government funds should be loaned to Westmoreland. Manager Stringham knew that the Government officials in charge doubted the sufficiency of the ore deposits. The court's finding that the primary purpose of the post-amendment drilling was to establish the presence of an adequate supply of ore is fully supported by the record. The Government was not required by the original contract to provide funds for exploratory drilling. The trial court reached a permissible conclusion in determining that the funds advanced by the Government to permit the exploratory drilling to determine the availability of ore constituted consideration for the amendment.

The trial court also found that the Government's agreement to pay standby costs after the shutdown was an expenditure not contemplated by the original contract, and hence constituted a consideration for the amendment. We can not say such finding was clearly erroneous.

■ The court's finding of consideration in the respects hereinabove set out fully supports his conclusion that Westmoreland's waiver of the moratorium provisions of the original contract was based upon a consideration. It is not necessary for the Government to establish all of the elements of consideration it asserts. Section 83, Restatement of Contracts, page 94, provides:

"Consideration is sufficient for as many promises as are bargained for and given in exchange for it if it would be sufficient

"(a) for each one of them if that alone were bargained for, or * * *."

See also Wright v. Iowa Southern Utilities Co., 230 Iowa 838, 298 N.W. 790, 793; 12 Am.Jur., Contracts, § 119, p. 612.

The Court also found that Westmoreland received a benefit and that the Government suffered a detriment by reason of the Government forbearing exercising its right to declare a default under the original contract. The court found that if Amendment No. 1 had not been executed the Government would have taken steps to declare a default on April 7, 1953, the date Westmoreland was required by the contract to commence production. The court further found that by reason of the amendment the Government forbore claiming such default and kept the contract open for nearly seven months and up until October 29, 1953. During such period, in addition to paying the wage, drilling, and standby costs of over $75,000, the Government gave good faith consideration to Westmoreland's request for additional funds, and incurred considerable investigating and engineering expenses in so doing. No definite time of forbearance is fixed by the amendment. However, it seems quite clear that all contracting parties contemplated that the contract would not be terminated before Westmoreland's application for additional funds had been considered and acted upon. It was obvious that considerable time would be required to assemble the necessary information to enable the Government to pass upon the loan application. Restatement of Contracts, section 90, page 110, provides:

"A promise which the promisor should reasonably expect to induce

action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

In Wright v. Iowa Southern Utilities Co., supra, 298 N.W. at page 793, the court states:

"In connection with appellee's contention that the 1932 agreement is not supported by sufficient consideration because appellant's promise to forbear was not for a definite time, we may observe that according to the later cases 'the absence of a specified period for forbearance has generally been held immaterial as the law presumes that it was to be for a reasonable time.' * * *"

See also 17 C.J.S. Contracts § 103d, p. 459; 12 Am.Jur., Contracts § 85, p. 580.

We think that it may be fairly said that the Government's forbearance was induced by Westmoreland's promise to waive the default provision of the original contract, and that injustice can be avoided only by enforcing the amendment. Under this record it clearly appears that if Westmoreland had not signed the amendment the Government would have served notice of default and given no consideration to the application for the increased loan. The Government loan was Westmoreland's only hope of salvaging anything out of its project. The records of Westmoreland's directors' and stockholders' meetings and the letter from Westmoreland's attorneys clearly indicate that Westmoreland thought it was obtaining a benefit by keeping the contract alive pending action on the loan application. We agree with the trial court's finding to the effect that "during that period of time Westmoreland's application for additional funds received serious, and we are satisfied, honest consideration." The Government assembled all data bearing on the advisability of granting the additional loan and continuing the West-moreland contract, and submitted such information to a panel of metallurgists. The panel recommended that no further funds be advanced. We have heretofore found that there was sufficient consideration to support the amendment. It is, therefore, not essential to the decision of this case that we find the Government's forbearance to assert a default also constituted a consideration for the amendment. It would seem, however, that there is a strong basis for asserting under this record that the Government's forbearance constituted an additional consideration for the amendment.

We have not attempted to set out in detail all of the voluminous and contradictory evidence contained in the record. We have carefully examined the record and are satisfied that the trial court's determination that Amendment No. 1 is supported by a consideration is fully supported by the record and is not clearly erroneous.

The judgment appealed from is affirmed.