The CONNECTICUT MUTUAL LIFE IN-
SURANCE COMPANY, Plaintiff-
Appellee,

v.

Lura Virginia Bickel Lee CARTER et al.,
Defendants-Appellants.

No. 29435.

United States Court of Appeals,
Fifth Circuit.

June 23, 1971.

Certiorari Denied Oct. 12, 1971.

See 92 S.Ct. 104.

J. A. McClain, Jr., John F. Turbiville, Hugh N. Smith, Asst. U. S. Atty., Thomas C. MacDonald, Jr., Tampa, Fla., for defendant-appellant, Lura Virginia; Bickel Lee Carter, Shackleford, Farrior, Stallings & Evans, P. A., McClain, Turbiville & Heller, Tampa, Fla., of counsel.

William D. Ruckelshaus, L. Patrick Gray, III, Asst. Attys. Gen., John L. Briggs, U. S. Atty., Robert V. Zener and Daniel Joseph, Attys., Dept. of Justice, Washington, D. C., for the United States.

Thomas R. Allen, of Anderson & Rush, Orlando, Fla., for The Connecticut Mutual Life Ins. Co.

ON PETITION FOR REHEARING

Before RIVES, AINSWORTH and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

We originally decided this appeal on April 7, 1971, Slip Opinion No. 29,435. However, upon further consideration, we have decided to grant the government's petition for rehearing and withdraw our initial decision. The following opinion is substituted in lieu thereof:

In this three-party contest, the mortgagor seeks to set aside the entire foreclosure sale while the United States, the second mortgagee, argues that its lien should come before the claim for attorneys' fees provided for in the first mortgage held by Connecticut Mutual Life Insurance Company. The district court held the second mortgage lien inferior to Connecticut Mutual's lien for attorneys' fees and confirmed the foreclosure sale despite the mortgagor's objections.

In January of 1962 Lura Virginia Bickel Lee Carter (mortgagor) mortgaged her Florida citrus farm property to Con-

necticut Mutual Life Insurance Company pursuant to an agreement which contained the standard provision for payment of attorneys' fees[1] by the mortgagor in the event of default on the underlying promissory note. A hard freeze occurred during the winter of 1962 severely damaging the mortgagor's citrus trees. Consequently, in July of 1963 the Farmers Home Administration (FHA), a branch of the federal government that extends agricultural credit when the need for such arises from a natural disaster, began lending the mortgagor sums of money secured by a second mortgage which also contained a provision for payment of attorneys' fees, and specifically stated that the second lien was subject to the mortgage held by Connecticut Mutual.[2]

When the mortgagor failed to meet the payments on the first mortgage, Connecticut Mutual initiated a foreclosure suit in the Florida state court in April, 1969. The action was removed to federal district court[3] where the trial judge granted foreclosure, and held that the mortgagor owed Connecticut Mutual $418,111.49 in principal and accrued interest and $11,500 as reasonable attorneys' fees. After the ensuing sale, at which the sole bidder, Connecticut Mutual, purchased the property for the approximate amount of the total indebtedness due it, the court held that, contrary to the contentions advanced by the government, the first mortgage lien for attorneys' fees was superior to the FHA second mortgage lien.

The court overruled without an adversary hearing the mortgagor's objections to the fairness of the sale.

The single disputed issue between the FHA and Connecticut Mutual involves the priority of the lien for attorneys' fees contained in the first mortgage. FHA contends its second mortgage is superior to Connecticut Mutual's lien for attorneys' fees because the amount of attorneys' fees was not choate (specific and certain) when the FHA mortgage attached in July of 1963. For authority, FHA relies principally upon three Supreme Court cases—United States v. Equitable Life Assurance Society of United States, 1966, 384 U.S. 323, 86 S. Ct. 1561, 16 L.Ed.2d 593; United States v. Pioneer American Insurance Co., 1963, 374 U.S. 84, 83 S.Ct. 1651, 10 L. Ed.2d 770; United States v. New Britain, Connecticut, 1953, 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520—which hold that under the well-known rule of "first in time, first in right" a federal tax lien is superior to all other liens not choate at the time the federal tax lien is filed.

FHA quite correctly points out that the choate lien test, although originating in the tax lien field, has been extended to give federally-held mortgages

---

1. The mortgage stated the following in regard to attorney's fees:

   "To pay to (Connecticut Mutual) promptly upon demand all costs, expenses and attorney's fees, including the cost of any title examination, supplemental abstract of title or title insurance, that may be incurred by (Connecticut Mutual) in any proceedings, legal or otherwise, affecting the mortgaged property, or any part thereof, or the title thereto, or the validity or priority of this mortgage or that may be incurred by (Connecticut Mutual) by reason of the failure of the Mortgagor to keep and perform any of the covenants or agreements contained here or in said promissory note. All such costs, expenses and attorneys' fees paid by (Connecticut Mutual) shall bear interest from the date of payment at the rate of 8% per annum until repaid by Mortgagor and shall with such interest, be a part of the debt secured by this mortgage.

   "This mortgage is intended by the parties to secure, and does and shall secure the payment, fully and completely, or any and all sums of money herein described. * * * "

2. FHA's mortgage expressly stated on its face that the second lien was "Subject to (sic) mortgage held by the Connecticut Mutual Life Insurance Company * *."

3. The case was removed to federal court because the United States was joined as a defendant by virtue of its status as second mortgagee. See 28 U.S.C. §§ 1444 and 2410.

priority over certain unrecorded liens which were admittedly superior under state law. United States v. Roessling, 5 Cir., 1960, 280 F.2d 933; United States v. Oswald and Hess, 3 Cir., 1965, 345 F.2d 886; United States v. County of Iowa, 7 Cir., 1961, 295 F.2d 257. However, our research reveals no decision which would elevate a government mortgage to a position of superiority under the facts of the present case where the FHA, operating as a private lender, voluntarily took a second mortgage fully aware (see footnote 2, supra) of the then existent attorneys' fees clause in the first mortgage. Thus, finding an absence of binding legal precedent, we proceed to a consideration of whether congressional intent commands priority of the government's security interest in the instant set of circumstances.

As previously noted, the choate lien test, contended for by the government, emanated from three Supreme Court cases, supra, all of which were decided before the passage of the Federal Tax Lien Act of 1966 (P.L. 89-719, 80 Stat. 1125), amending 26 U.S.C. § 6323. The amendment substantially altered the priorities of federal tax liens so that a lien for attorneys' fees if valid under local law is no longer subordinate to a subsequently-filed federal tax lien.[4] Although the 1966 amendment does not of itself affect the priority of the claims here involved,[5] the statute diminishes the validity of the choate lien test in the important field of taxation where the doctrine originated. It would indeed be anomalous and contrary to our view of congressional intent to allow the FHA operating as a money-lending agency to prevail in a situation where the government as holder of a tax lien would have an inferior security interest. Ault v. Harris, D. Alaska, 1968, 317 F.Supp. 373, (aff'd. and opinion adopted) Ault v. United States, 9 Cir., 1970, 432 F.2d 441; Standard Savings and Loan Association v. Evans (S. Carolina Spr. Ct., 1970), 178 S.E.2d 145. The collection of taxes is certainly more vital to the government's existence than the making of farm loans and if Congress determines (as it has) that a federal tax lien, involuntarily imposed upon the government, is not unduly threatened by an inchoate lien for attorneys' fees, then we see no reason to exempt a federal mortgage lien, which the government sought to obtain, from the operation of a provision for attorneys' fees in a first mortgage. By making farm loans, FHA became subject to the same requirements of local law which govern the validity of security interests in respect to all other lenders. The district court's order granting priority to Connecticut Mutual's lien for attorneys' fees over FHA's second mortgage is therefore affirmed.

The next issue we must deal with is mortgagor Carter's contention that the district court erred by failing to grant a hearing on her objections that the sale was unfair. Under Florida Statutes, § 702.02(5), F.S.A., the value of property sold at a foreclosure sale is conclusively presumed to be the amount bid at the sale unless objections are filed within ten days in which case "such objections shall be *considered* by the court". (Emphasis supplied). After Mrs. Carter filed objections within the 10-day period, the district court stated that it had "considered the motion and memorandum thereto. * * *" and then entered an order confirming the sale.

---

4. In pertinent part, 26 U.S.C. § 6323 provides as follows:
"(b) Even though notice of a lien imposed by section 6323 (federal tax lien) has been filed, such lien shall not be valid—
"(8) *Attorneys' liens.*—With respect to judgment. * * * as against an attorney who, under local law, holds a lien * * *."

5. See, for example, H. B. Agsten & Sons, Inc. v. Huntington Trust and Savings Bank, 4 Cir., 1967, 388 F.2d 156, cert. den. 390 U.S. 1025, 88 S.Ct. 1413, 20 L.Ed.2d 282, where the court held that the Federal Tax Lien Act of 1966 did not by implication overrule the Federal Insolvency Statute, 31 U.S.C. § 191.

Mrs. Carter now asserts that under § 702.02(5), supra, the court should have gone further and conducted a hearing to determine the validity of the objections. We cannot agree.

[7] In the first instance, Mrs. Carter at no time requested the district court to hold a hearing. Secondly, the statute requires only that the court "consider" the objections and we find an absence of any indication from the Florida courts that the term "consider" must be defined to require the convening of a hearing. Finally, an examination of the specific objections raised by the mortgagor reveals that they were not of such a nature as would necessitate the taking of additional testimony or the hearing of evidence.

[8] The mortgagor first alleged in her objections that the land should have been sold in parcels rather than en masse. Although this was perhaps the strongest of the objections, a review of the record discloses the mortgagor received a full-blown hearing on the parcel-en masse issue prior to the sale.

[9] The mortgagor's second objection was that Connecticut Mutual promised to seek a 90-day postponement of the sale if the mortgagor would pay $25,000 before the sale, and that when the mortgagor offered the $25,000, Connecticut Mutual declined to accept payment. The offer by Connecticut Mutual was obviously unsupported by consideration, and the question of promissory estoppel did not arise since the mortgagor did not allege that she relied upon the promise to her detriment. Proving the factual validity of the mortgagor's allegations at an evidentiary hearing would have been pointless since the objection, even if true, would not have been a ground for setting aside the sale.

[10, 11] Thirdly, the mortgagor objected that the sale price was inadequate. Under Florida law, mere inadequacy of

purchase price, without more being alleged, is not a ground for setting aside a foreclosure sale, Maule Industries Inc. v. Seminole Rock and Sand Company, 1957, Fla., 91 So.2d 307; Desser and Garfield, Inc. v. Teachers Insurance and Annuity Association of America, 1967, Fla.App., 201 So.2d 497, and this rule seems particularly applicable in the case at hand where the sum offered by any prospective bidder would inevitably be affected and reduced by the government's right to redeem the property within one year of the sale under 28 U.S.C. 2410(c).[6] The court was aware of the price bid at the sale, $434,000; of the maximum value alleged by the mortgagor, $1,000,000; and of the government's statutory right of redemption. Having these facts before it, the court was well equipped to "consider" the objection of inadequate purchase price without holding a hearing. The mortgagor simply failed to make allegations which, taken to be true, would justify voiding the sale under Florida law.

[12] Lastly, the mortgagor challenged the advertising of the property as inadequate. A hearing was not necessary here because the district court could easily determine that the advertising complied with the statutory requirements. See Florida Statutes, § 702.02(2), F.S.A.

[13] Subsequent to oral argument, we were informed by counsel for the government that the United States, as junior lienor, exercised its statutory right of redemption under 28 U.S.C. § 2410 (c) by paying Connecticut Mutual $475,-452.66, the full amount of the first mortgage together with attorneys' fees, court costs, and accrued interest. Having done so, the government presently has title to the realty, Quinn Plumbing Co. v. New Miami Shores Corporation, 1930, 100 Fla. 413, 129 So. 690, but, as conceded in the government's brief, Mrs. Carter's account must be credited with a sum

---

6. " * * * Where a sale of real estate is made to satisfy a lien prior to that of the United States, the United States shall have one year from the date of sale within which to redeem. * * * " 28 U.S.C. § 2410(c).

equal to that which would have been credited her if the United States had bid at the foreclosure sale the amount that the Farmers Home Administration's regulations [7 C.F.R. 1872.17(b) (3) (vi) ] required it to bid. We therefore remand the case to the district court with directions that the United States credit Mrs. Carter's account with an amount consistent with whatever sum the court determines the government would have bid at the foreclosure sale.[7] In this manner, the parties will be restored to the position they would have occupied had the government initially purchased the property from the foreclosure sale.

Affirmed in part and remanded with directions.

RIVES, Circuit Judge, (dissenting):

When we originally decided this appeal, all three judges had thought that the exercise of the Government's statutory right of redemption rendered moot the issue of priority of liens. I now agree with my brothers that that issue had not become moot, but, with all deference, I cannot agree with their present decision granting priority to Connecticut Mutual's inchoate lien for attorneys' fees over the lien of FHA's second mortgage. On the second issue as to the necessity for an evidentiary hearing on the mortgagor's objections to the confirmation of the foreclosure sale, I had thought that the Government's credit of the mortgagor's account with the amount which FHA should have bid at the foreclosure sale would probably be enough to satisfy the mortgagor and had, therefore, concurred in the result of the majority's decision. The mortgagor proved to be anything but satisfied. On the merits of that issue also, with all deference, I disagree with the majority's disposition.

In my opinion, (1) the lien of FHA under its second mortgage is superior to Connecticut Mutual's lien for attorney's fees; and (2) the district court erred by failing to grant the mortgagor an evidentiary hearing on her objections to the confirmation of the foreclosure sale.

### 1. Priority of Liens

It seems to me settled law that prior to the Federal Tax Lien Act of 1966,[1] both federal tax liens[2] and federal mortgage liens[3] took priority over all competing liens except those which became "choate"[4] before the federal lien attached. The Federal Tax Lien Act of 1966 by its terms applies only to *tax* debts, and I submit that it does not impliedly change the rule in cases involving federal mortgage liens. Indeed the

---

7. Although the government stated in its brief that it would have bid $900,000 at the foreclosure sale, it also stated that the maximum bid under the regulations, 7 C.F.R. 1872. 17(b) (3) (vi), is the lesser of gross investment or estimated resale value. Assuming, as the government contends, that the amount bid would have been estimated resale value, such a determination may require the hearing of evidence by the district court.

1. Pub.L.No.89–719, 80 Stat. 1125, amending 26 U.S.C. § 6323.

2. United States v. New Britain, 1954, 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520; United States v. Pioneer American Ins. Co., 1963, 374 U.S. 84, 83 S.Ct. 1651, 10 L.Ed.2d 770; and United States v. Equitable Life Assur. Soc., 1966, 384 U.S. 323, 86 S.Ct. 1561, 16 L.Ed.2d 593.

3. United States v. Roessling, 5 Cir. 1960, 280 F.2d 933, 935–936; Southwest En-

gine Co. v. United States, 10 Cir. 1960, 275 F.2d 106; United States v. County of Iowa, 7 Cir. 1961, 295 F.2d 257; W. T. Jones & Co. v. Foodco Realty, Inc., 4 Cir. 1963, 318 F.2d 881, 889, n. 19; United States v. Oswald and Hess Co., 3 Cir. 1965, 345 F.2d 886. The Supreme Court also in the *New Britain* case, *supra*, equated mortgage liens with statutory liens, 347 U.S. at 84, 74 S.Ct. at 367.

4. That is certain as to lienor, liened property, and amount. United States v. New Britain, *supra*, 347 U.S. at 84, 74 S.Ct. at 367; United States v. Pioneer American Ins. Co., *supra*, 374 U.S. at 89, 83 S.Ct. 1651; United States v. Equitable Life Assur. Soc., *supra*, 384 U.S. at 327, 238, 86 S.Ct. at 1561. The last two of those decisions held specifically that an attorney's fee for foreclosing a first mortgage does not give rise to a "choate" lien until the amount of the fee has become certain.

majority opinion concedes, as it must, that the statute "does not of itself affect the priority of the claims here involved." Instead, it casts FHA in the role of "a private lender" which "voluntarily took a second mortgage" with notice of the attorney's fee clause in the first mortgage and says that, "It would indeed be anomalous and contrary to our view of congressional intent to allow the FHA operating as a money-lending agency to prevail in a situation where the government as holder of a tax lien would have an inferior security interest."

I submit that FHA should not be cast in the role of a "private lender." A private lender is properly actuated by motives of profit, and is free to refuse to lend money on a second mortgage. By contrast, FHA lends money pursuant to a public policy mandated by Congress, for example, where (as in this case) a natural disaster has created a need for agricultural credit which cannot be met from other sources (7 U.S.C. § 1961). In other instances, FHA makes loans to aid in the purchase and operation of family farms (7 U.S.C. §§ 1922–1923, 1941–1942); to help farmers in land and water development, use and conservation (7 U.S.C. § 1924); and for other such purposes (see 7 U.S.C. §§ 1921–1991). The Congress provided that if credit is reasonably available from private sources FHA cannot make a loan (7 U.S.C. §§ 1922(4), 1941(4), 1961(a) (1), 1983(a), (c)).

This case furnishes a good illustration of the difference between FHA and a private lender. Connecticut Mutual lent the mortgagor $375,000 in January 1962. In the winter of 1962-63, the mortgaged citrus farm was damaged by a freeze. In 1963, FHA began to make emergency loans to the mortgagor even though her operation had been so damaged by the freeze that she was unable to meet the principal payment due to Connecticut Mutual at the beginning of 1964. She never made another principal payment (with the exception of $5,000 paid in 1969). When the first FHA loan was made the damage to the farm had occurred, but Connecticut Mutual's mortgage loan was not in default.[5] FHA continued making advances after there was a default.

It is because FHA and other government loans are made for public rather than commercial purposes that a special rule of priority applies to govern federal loans. The lien choateness test serves to limit the benefit that other lienors can receive from federal loans by providing that those liens which have not become certain as to identity of lienor, liened property, and amount of claim by the time the federal lien attaches must be subordinated to the federal claim in order that the financial aid which is the object of the federal loan will go either to the mortgagor or, if the loan fails, back to the Federal Government, and not to leave open the probability that a first mortgagee, which was not intended by Congress to be the beneficiary of federal financial assistance, should be the true beneficiary through replenishment of its security.

With deference, I submit that my brothers tread upon the powers of Congress when they find that, "The collection of taxes is certainly more vital to the government's existence than the making of farm loans and if Congress determines (as it has) that a federal tax lien, involuntarily imposed upon the government, is not unduly threatened by an inchoate lien for attorneys' fees, then we see no reason to exempt a federal mortgage lien, which the government sought to obtain, from the operation of a provision for attorneys' fees in a first mortgage." (Majority opinion, p. 5.) That seems contrary to the reasoning of Judge Sobeloff in holding the 1966 Tax

5. Under the standard laid down in *Equitable Life, supra,* 384 U.S. at 328, 329, 86 S.Ct. at 1565, "No liability [for at-torneys' fees] having been incurred there could of course be no lien in existence at the time the federal lien matured."

Lien Act inapplicable to the Federal Insolvency Statute, 31 U.S.C. § 191:

"The language and legislative history of the statute [1966 Tax Lien Act], however, convince us that Congress did not purpose to elevate inchoate mechanics' liens over federal contractual claims. The terms of the statute and the detailed Committee reports of both houses of Congress[4] speak repeatedly of subordinating federal unrecorded *tax* liens to mechanics' liens, never intimating a design to broaden the subordination to include other federal claims.

\*   \*   \*   \*   \*   \*

"We cannot say that it is illogical for Congress to deem it desirable to retain a priority for money it loans, while relinquishing the priority for its tax liens, which represent no financial outlay. Whatever may be the merits of symmetry in these two quite distinct, if cognate, areas the argument seems more properly addressed to Congress than to this court.

"4. S.Rep. No.1708, 89th Cong.2d Sess. (1966); H.Rep. No.1884, 89th Cong.2d Sess. (1966), U.S.Code Cong. & Admin. News 1966, p. 3722."

H. B. Agsten & Sons, Inc. v. Huntington Trust & Savings Bank, 4 Cir. 1967, 388 F.2d 156, 160.

The revenues of the United States now rest upon a broad and certain tax base. Government taxes are so certain that the President is recommending to the Congress that the Government share its revenues with the States and municipalities. It is not irrational for Congress to think that the Government can afford to relax in favor of private liens the protection heretofore afforded liens for taxes, but that the strict protection should remain in force as applied to the limited and specific appropriations made by Congress to federal lending agencies. Such strict protection is all the more needed as against liens for attorneys' fees for foreclosing mortgages, for at least two reasons, (1) that the amounts of such fees are extremely elastic and (2) that such fees allowed in states where foreclosure is customarily effected by suit in court are much larger than the fees charged in states where the simpler method of foreclosure under power of sale is customary. In any event, Judge Sobeloff was correct in holding that such an argument is more properly addressed to Congress than to the courts. I decline to join in extending the Federal Tax Lien Act of 1966 to include FHA or other federal mortgage liens.

2. *Failure to Grant Hearing on Objections to Foreclosure Sale.*

It seems to me that the mortgagor did not have to expressly request a hearing on her objections to the confirmation of the foreclosure sale any more so than a party plaintiff or defendant has to expressly ask the court for a hearing before ruling on the merits of a law suit. The kind of hearing necessary depends upon the circumstances of the particular case. I quote three grounds of Mrs. Carter's timely filed objection:

"1) The only bid received in the aforesaid sale was that of The Connecticut Mutual Life Insurance Company, holder of the first mortgage, which bid the property in for approximately $434,000.00. This bid price is grossly inadequate in proportion to the value of the property. Defendant is informed and believes that the Farmers Home Administration, the holder of the second mortgage for approximately $500,000.00 on said lands, had previously appraised the property at a value in excess of $1,000,000.00.

\*   \*   \*   \*   \*   \*

"4) As a result of the inadequacy of the advertising, sale of the property en masse, and the sale in one county of property situated in two different counties, with the resulting gross inadequacy of price bid, the Defendant LURA VIRGINIA BICKEL LEE CARTER stands to suffer serious economic harm and is in jeopardy of having default judgment rendered against her in favor of the Farmers Home Administration, which holds a second mortgage on said lands,

in the amount of $500,000.00, said second mortgagee having made no bid at the aforesaid sale.

"5) Defendant LURA VIRGINIA BICKEL LEE CARTER was informed by the Plaintiff that if she would pay $25,000.00 before the sale on December 18, 1969, the Plaintiff would seek a postponement of the sale and permit the said Defendant to have 90 additional days to pay up any arrearage with respect to Plaintiff's mortgage on said lands. In reliance on said promise, said Defendant offered to the Special Master and to the attorney for the Plaintiff to pay the sum of $25,000.00 prior to the actual sale, which offer of payment was declined and the sale was effected, beginning at 11:00 A.M., December 18, 1969." (App. pp. 14, 15, 16.)

I submit that the mortgagor's objections raised genuine issues as to material facts upon which she was entitled to an evidentiary hearing prior to the sale. The record discloses that the district judge acted without knowing [6] that the two parcels of land, one situated in Pasco County and the other in Hernando County, were at least eight miles apart.

My brothers say that, "Under Florida law, mere inadequacy of purchase price, without more being alleged, is not a ground for setting aside a foreclosure sale." (Majority opinion, p. 140.) That may be true, but I submit that the Florida law is in line with that generally prevailing, that a judicial foreclosure sale will be set aside for such gross inadequacy of price as impeaches the fairness of the sale. In Marsh v. Marsh, 1916, 72 Fla. 142, 72 So. 638, 639, it was said:

"In Macfarlane v. Macfarlane, *supra* [50 Fla. 570, 39 So. 995], following the prior holding in Lawyers' Co-operative Publishing Co. v. Bennett, *supra* [34 Fla. 302, 16 So. 185], and in

line with the general rule established by the courts, we stated that, while mere inadequacy of price would not be sufficient to warrant the setting aside of a judicial sale—

"'when such inadequacy is connected with or shown to result from any mistake, accident, surprise, misconduct, fraud, or irregularity, the sale will generally be set aside.'

"We also referred with approval to the holding in Schroeder v. Young, 161 U.S. 334, 16 S.Ct. 512, 50 L.Ed. 721:

"'While mere inadequacy of price has rarely been held sufficient in itself to justify setting aside a judicial sale of property, courts are not slow to seize upon other circumstances impeaching the fairness of the transaction, as a cause for vacating it, especially if the inadequacy be so gross as to shock the conscience.'"

It now appears from the Government's exercise of its statutory right to redemption that Connecticut Mutual's successful bid of $434,000.00 was less than half of the value of the mortgaged property.

My brothers say that "the sum offered by any prospective bidder would inevitably be affected and reduced by the government's right to redeem the property within one year of the sale under 28 U.S.C. § 2410(c)." (Majority opinion, p. 140.) My brothers fail to note that the same statute also provides that in exercising its right of redemption the Government must pay interest "at 6 percent per annum from the date of such sale, and (3) the amount (if any) equal to the excess of (A) the expenses necessarily incurred in connection with such property, over (B) the income from such property plus (to the extent such property is used, by the purchaser) a reasonable rental value of such property." 28 U.S.C. § 2410(d) (2) & (3). Those provisions might effectively prevent the Government's statutory right of redemp-

---

6. "THE COURT: * * * And I think if it is contiguous or closely contiguous, why it ought to be sold at one time.

"MR. McCLAIN [Mortgagor's Counsel]: Well, I was told differently." [App. p. 67.]

tion from chilling bids as apprehended by the majority.

My brothers say: "Lastly, the mortgagor challenged the advertising of the property as inadequate. A hearing was not necessary here because the district court could easily determine that the advertising complied with the statutory requirements. See Florida Statutes, § 702.02(2)." (Majority opinion, p. 140.)

The mortgagor's objection did not go to any failure to give legal notice of the sale but to the need of additional advertising. [See ground 2 of the mortgagor's objection, App. p. 14.] In urging such a need prior to the sale, mortgagor's attorney had made that plain:

"MR. McCLAIN [Mortgagor's attorney]: With any legal notice it is always this way. I mean if you just get a very cold notice that something is going to be sold, it just does not normally, Your Honor, attract anybody to bid. And this is important property. It is strategically located. I don't think it takes any realtor to know this." (App. p. 60.)

My brothers say "the statute [Florida Statutes § 702.02(5)] requires only that the court 'consider' the objections and we find an absence of any indication from the Florida courts that the term 'consider' must be defined to require the convening of a hearing." (Majority opinion, p. 140.) So far as I have found, the Florida courts have not had occasion to define "consider" as used in that statute either way, that is, to require or not to require an evidentiary hearing. I would think that the necessity of a hearing would depend upon the nature of the objections. In this case, I submit that to meaningfully "consider" the objections requires that the mortgagor be given an opportunity to prove the facts which she averred.

The only court which can finally and authoritatively construe the Florida Statute is the Supreme Court of Florida. It seems to me that the ends of justice require us to grant the mortgagor's

request that, pursuant to Rule 4.61, Florida Appellate Rules, 32 F.S.A., and Section 25.031, Florida Statutes, we certify an appropriate question to the Supreme Court of Florida for its decision. My brothers decline so to do.

For the reasons stated, I respectfully dissent as to both issues decided.